**David G. KEY, Plaintiff,**

**and**

**Michigan Protection and Advocacy Svc., Plaintiff–Intervenor,**

**v.**

**Henry GRAYSON, Kenneth McGinnis, Gary Gabry, Paul Rencio, and Bill Martin, Defendants.**

**No. CIV. 96–40166.**

United States District Court, E.D. Michigan, Southern Division.

Sept. 5, 2001.

700

Daniel E. Manville, Ferndale, MI, Gayle C. Rosen, Ann Arbor, MI, for Plaintiff.

John L. Thurber, Office of the Attorney General, Correctional Division, Lansing, MI, for Defendant.

## OPINION AND ORDER

GADOLA, District Judge.

Before the Court are the report and recommendation of Magistrate Judge Donald Scheer [docket entry 273] and the objections and responses thereto. Pursuant to Local Rule 7.1(e), the Court concludes that a hearing would not aid in the disposition of these matters. For the reasons set forth below, the Court accepts and adopts the Magistrate Judge's report and recommendation, except insofar as it pertains to Plaintiff's ability to: (1) bring suit against Defendants in their individual capacities pursuant to 42 U.S.C. § 12203(a); (2) seek recovery for emotional or mental injuries in light of 42 U.S.C. § 1997e(e) of the Prison Litigation Reform Act ("PLRA"); and (3) proceed with his claim under the Michigan Persons With Disabilities Civil Rights Act ("MPDCRA"), M.C.L. 37.1301, et seq. This Court holds, for reasons set forth below, that Defendants in their individual capacities are not amenable to suit under § 12203(a) and that § 1997e(e) is no obstacle to Plaintiff's recovery for emotional or mental injuries. The Court will also dismiss without prejudice Plaintiff's claim under the MPDCRA because that claim raises a novel and complex issue of state law. See 28 U.S.C. § 1367(c) (2001).

## I BACKGROUND

The facts in detail are as set forth in Magistrate Judge Scheer's report and recommendation, which is published in conjunction with this opinion and order. Plaintiff is a prisoner in the Michigan Department of Corrections ("MDOC").

Plaintiff brings suit against Defendants, all of whom were, or are, prison officials. All Defendants face suit in their official and individual capacities, except for Defendant McGinnis, who faces suit only in his individual capacity.

In his fourth amended-complaint, Plaintiff brings several causes of action against Defendants. He alleges that Defendants violated: the Americans With Disabilities Act ("ADA"), 42 U.S.C. § 12101, et seq.; the Rehabilitation Act of 1973, 29 U.S.C. § 794, as amended; and, the MPDCRA. Plaintiff grounds all of these claims in the allegation that Defendants denied him public services because of his hearing disability. Plaintiff also claims that Defendants violated the ADA's anti-retaliation provision, 42 U.S.C. § 12203(a), by retaliating against him for pursuing this suit.

On March 20, 2001, Magistrate Judge Scheer issued his report and recommendation regarding Defendants' motion to dismiss pursuant to Federal Rules of Civil Procedure 12(b)(6) and 56(b). The Magistrate Judge, after meticulous analysis, recommended that this Court allow Plaintiff to proceed only with his claims for: (1) injunctive relief under the ADA and the Rehabilitation Act; (2) retaliation under 42 U.S.C. § 12203(a) against Defendants in their individual capacities; (3) violations of the MPDCRA that accrued before March 10, 2001; and (4) monetary damages against Defendants in their official capacities under the Rehabilitation Act.

This Court now evaluates the Magistrate Judge's report and recommendation.

## II LEGAL STANDARD

The Court's standard of review of a Magistrate Judge's report and recommendation depends upon whether a party objected to that document. As to the

parts of the report and recommendation to which no party has objected, the Court need not conduct a review by any standard. *Wallace v. Housing Auth.*, 791 F.Supp. 137, 138 (D.S.C.1992) (citation omitted). The Court reviews de novo, however, the portions of a report and recommendation to which a specific objection has been made. *Thomas v. Halter*, 131 F.Supp.2d 942, 944 (E.D.Mich.2001) (Gadola, J.). Federal Rule of Civil Procedure 72(b) provides this standard of review. It states, in pertinent part, that

[t]he district judge to whom the case is assigned shall make a de novo determination upon the record, or after additional evidence, of any portion of the magistrate judge's disposition to which specific written objection has been made in accordance with this rule. The district judge may accept, reject, or modify the recommended decision, receive further evidence, or recommit the matter to the magistrate judge with instructions.

Because parties filed timely objections to the Magistrate Judge's report and recommendation, this Court reviews de novo those portions to which objection has been made. *See Thomas*, 131 F.Supp.2d at 944. ▆▆▆▆ De novo review in these circumstances entails at least a review of the evidence that faced the Magistrate Judge; the Court may not act solely on the basis of the Magistrate Judge's report and recommendation. 12 Charles A. Wright, Arthur R. Miller, & Richard L. Marcus, *Federal Practice and Procedure* § 3070.2 (2d ed.1997) (citing *Hill v. Duriron Co.*, 656 F.2d 1208, 1215 (6th Cir.1981)). Whether the Court supplements the record by entertaining further evidence is a matter committed to the Court's discretion. *Id.* After conducting this review, the Court is free to accept, reject, or modify the findings or recommendations of the Magistrate Judge. *Wallace*, 791 F.Supp. at 138. If the Court were to adopt the Magistrate Judge's report and recommendation, the Court would not need to state with specificity what it reviewed; it is sufficient for the Court to say that it has engaged in a de novo review of the record and adopts the Magistrate Judge's report and recommendation. 12 Wright, Miller, & Arthur, § 3070.2.

## III ANALYSIS

Having conducted the review delineated above, the Court will accept and adopt the Magistrate Judge's report and recommendation, except insofar as it pertains to Plaintiff's ability to: (1) bring suit against Defendants in their individual capacities pursuant to 42 U.S.C. § 12203(a); (2) seek recovery for emotional or mental injuries in light of 42 U.S.C. § 1997e(e) of the PLRA; and (3) proceed with his claim under the MPDCRA. This Court holds, for reasons set forth below, that Defendants in their individual capacities are not amenable to suit under § 12203(a) and that § 1997e(e) is no obstacle to Plaintiff's recovery for mental or emotional damages. The Court will also dismiss without prejudice Plaintiff's claim under MPDCRA pursuant to 28 U.S.C. § 1367(c) because that claim raises a novel and complex issue of state law.

### A. Section 12203(a)

Congress, speaking for the American people, passed Title II of the ADA in order to prohibit discrimination against the handicapped in public services. 42 U.S.C. § 12132. Toward that end, Congress chose to allow people who believe that they have endured such discrimination to file suit under the statute. So that plaintiffs would not suffer for pursuing such legal action, Congress also included within the ADA an anti-retaliation provision, under which Plaintiff seeks relief from Defen-

dants in their individual capacities. The text of that provision follows:

(a) Retaliation. No person shall discriminate against any individual because such individual has opposed any act or practice made unlawful by this Act or because such individual made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this Act.

42 U.S.C. § 12203(a). The question becomes whether Defendants in their individual capacities are persons within the ambit of § 12203(a).

To address this issue, the Court must apply the rules of statutory interpretation. Unfortunately, there is some dispute as to what those rules are or should be. That difference of opinion has led some scholars to conclude that courts employ the varying theories of statutory interpretation, as expressed in scholarly literature, merely "to add academic luster to decisions ultimately based on other grounds, rather than as significant factors in the underlying decision-making process." Gregory Scott Crespi, *The Influence of a Decade of Statutory Interpretation Scholarship on Judicial Rulings: An Empirical Analysis*, 53 SMU L.Rev. 9, 11 (2000). Lest there be any ambiguity regarding why this Court interprets the ADA's anti-retaliation provision as it does, the Court will carefully enunciate its process of statutory interpretation.

The Court begins with the observation that, in a republic such as ours, "the people are the only legitimate foundation of power." *The Federalist No. 49*, at 348 (James Madison) (Benjamin Fletcher Wright ed., 1961); *accord* "James Wilson Replies to Findley, December 1, 1787," Pennsylvania Ratifying Convention, *reprinted in* 1 *The Debate on the Constitution* 820 (Bernard Bailyn ed., 1993). At the national level, the people express their will through Congress. *See Connecticut v. EPA*, 696 F.2d 147, 155 (2d Cir.1982); *see also* 1 Alexis de Tocqueville, *Democracy in America* 254 (Francis Bowen trans., Phillips Bradley ed.1945) (observing that "[o]f all political institutions, the legislature is the one that is most easily swayed by the will of the majority"). Thus, when deciding whether Defendants are persons within the ambit of § 12203(a), the Court's object is to ascertain the meaning of the words that the people, acting through Congress, enacted into law. *See generally* Frank H. Easterbrook, *Text, History, and Structure in Statutory Interpretation*, 17 Harv. J.L. & Pub. Pol'y 61, 67–70 (1994). This is so because, ultimately, "[t]he text is the law, and it is the text that must be observed." Antonin Scalia, *A Matter of Interpretation: Federal Courts and the Law* 3, 22 (1997) (quoted in *United States v. Evans*, 148 F.3d 477, 483 n. 8 (5th Cir.1998)).

To ascertain a statutory text's meaning, the Court must begin with the statutory language itself, considering both the text and structure of the statute. *Walker v. Bain*, 257 F.3d 660, 2001 WL 823612 (6th Cir. July 20, 2001) (page citations unavailable). "[U]nless otherwise defined, words will be interpreted as taking their ordinary, contemporary, common meaning." *Perrin v. United States*, 444 U.S. 37, 42, 100 S.Ct. 311, 62 L.Ed.2d 199 (1979). In this case, the ADA itself defines "person" to include "one or more individuals." *Cable v. Department of Developmental Svcs.*, 973 F.Supp. 937, 943 (C.D.Cal.1997) (citing 42 U.S.C. §§ 2000e and 12111(7)). Interpreting § 12203(a) by itself and literally, it would at first seem that Defendants are persons within the meaning of the ADA's anti-retaliation provision and thus amenable to suit as individuals.

The Court's evaluation of § 12203(a) within the structure of the ADA, however,

suggests the opposite result. This is so because § 12203(c) prescribes remedies for retaliation under § 12203(a) according to the type of retaliation that the plaintiff alleges. *Van Hulle v. Pacific Telesis Corp.*, 124 F.Supp.2d 642, 646 (N.D.Cal. 2000) (citing *Stern v. California State Archives*, 982 F.Supp. 690, 694 (E.D.Cal. 1997)). As it relates to this case, § 12203(c) refers a plaintiff asserting that a defendant retaliated against him in the provision of public services to § 12133, which is Title II's remedies provision. *Id.* Section 12133, in turn, incorporates 29 U.S.C. § 794a, which is the remedies provision of the Rehabilitation Act. Section 794a, for its part, dictates that a plaintiff's remedies are as "set forth in" 42 U.S.C. § 2000e–16 and 42 U.S.C. § 2000d *et seq.*, both of which are elements of the Civil Rights Act of 1964.

█ The remedies "set forth" in § 2000e–16, however, are available only where the defendant is a "head of department, agency, or unit" sued in his official capacity. *Mays v. U.S.P.S.*, 928 F.Supp. 1552, 1568 (M.D.Ala.1996) (citing § 2000e–16(c)); *King v. Dalton*, 895 F.Supp. 831, 844 (E.D.Va.1995); *Weiss v. Marsh*, 543 F.Supp. 1115, 1116–17 (M.D.Ala.1981). In other words, § 2000e–16 allows for no remedy against a defendant being sued in his individual capacity. Section 2000d *et seq.*, for their part, "set forth" no remedies. *See Tafoya v. Bobroff*, 865 F.Supp. 742, 748–49 (D.N.M.1994); *Tanberg v. Weld County Sheriff*, 787 F.Supp. 970, 972 (D.Colo.1992).

█ None of the remedies available for violating § 12203(a) apply against a defendant in his individual capacity. It would thus be absurd to hold that Plaintiff may proceed against Defendants in their individual capacities pursuant to § 12203(a). Accordingly, this Court holds that § 12203(a) creates no individual liability under the ADA for retaliating in relation to the provision of public services. Plaintiff may not proceed against Defendants in their individual capacities pursuant to that provision.

In so holding, this Court joins the majority of courts that, to this Court's knowledge, have considered the issue. *See Baird v. Rose*, 192 F.3d 462, 472 (4th Cir.1999); *Van Hulle*, 124 F.Supp.2d at 645; *Santiago v. City of Vineland*, 107 F.Supp.2d 512, 551–52 (D.N.J.2000); *Kautio v. Zurich Ins. Co.*, No. 97–2411, 1998 WL 164623, at *1–2 (D.Kan. Mar.18, 1998); *Cable*, 973 F.Supp. at 943; *cf. Hiler v. Brown*, 177 F.3d 542, 545–47 (6th Cir.1999) (holding that individuals who are not employers under Title VII cannot be held personally liable for retaliation under the Rehabilitation Act). *But see Smith v. University of the State of New York*, No. 95–CV–0477, 1997 WL 800882 at *7–8 (W.D.N.Y. Dec.31, 1997) (Elfvin, J.); *Ostrach v. Regents of the University of California*, 957 F.Supp. 196, 200 (E.D.Cal. 1997).

**B. Recovery of Mental or Emotional Damages in Light of The Prison Litigation Reform Act**

█ The Magistrate Judge reasoned that 42 U.S.C. § 1997e(e) of the PLRA "forecloses recovery by Plaintiff for emotional and mental injuries." (R & R at 27.) For the reasons set forth below, this Court respectfully disagrees.

Plaintiff filed this case on April 10, 1996, which was before § 1997e(e)'s effective date of April 26, 1996. *Thaddeus–X v. Wozniak*, No. 99–1720, 2000 WL 712383, at *3 (6th Cir. May 23, 2000). Section 1997e(e) does not apply retroactively. *Tensley v. Perry*, No. 97–2280, 1999 WL 96986, at *1 (6th Cir. Feb.2, 1999); *Craig v. Eberly*, 164 F.3d 490, 493–95 (10th Cir. 1998) (Tacha, J .); *Swan v. Banks*, 160

F.3d 1258, 1259 (9th Cir.1998); *Shabazz v. Cole,* 69 F.Supp.2d 177, 196 (D.Mass.1999); *Cunningham v. Eyman,* 11 F.Supp.2d 969, 972–75 (N.D.Ill.1998); *Bolton v. Goord,* 992 F.Supp. 604, 625 (S.D.N.Y.1998); *cf. Wright v. Morris,* 111 F.3d 414, 417–18 (6th Cir.1997) (reasoning that § 1997e(a) does not apply retroactively). *But see Abul'Umar v. Price,* No. 09–00–331–CV, 2001 WL 332605, at *6–7 (Tex. Ct.App. April 5, 2001). Therefore, § 1997e(e) does not foreclose Plaintiff's ability to recover for mental or emotional damages.

## C. MPDCRA

▮▮▮ Plaintiff invokes this Court's supplemental jurisdiction over his claim under the MPDCRA. This Court has discretion to exercise its supplemental jurisdiction. 28 U.S.C. § 1367(c); *United Mine Workers v. Gibbs,* 383 U.S. 715, 86 S.Ct. 1130, 16 L.Ed.2d 218 (1966). In exercising its discretion, the Court must look to "considerations of judicial economy, convenience and fairness to the litigants" and avoid needless decisions of state law. C. Wright, A. Miller & E. Cooper, *Federal Practice & Procedure* § 3567.1 (2d ed.1984).

Recent litigation in the federal courts involving federal law claims together with supplemental state law claims has caused procedural and substantive problems. Although the federal and state claims in this action arise out of the same factual situation, litigating these claims together may not serve judicial economy or trial convenience.

Because federal and state law each have a different focus, and because the two bodies of law have evolved at different times and in different legislative and judicial systems, in almost every case with supplemental state claims, the courts and counsel are unduly preoccupied with substantive and procedural problems in reconciling the two bodies of law and providing a fair proceeding.

The attempt to reconcile these two distinct bodies of law often dominates and prolongs pre-trial practice, complicates the trial, makes the jury instructions longer, confuses the jury, results in inconsistent verdicts, and causes post-trial problems with respect to judgment interest and attorney fees. Thus, it appears that in many cases the apparent judicial economy and convenience of the parties' interest in the entertainment of supplemental state claims may be offset by the problems they create.

This action is no exception to the rule. As is self evident from Magistrate Judge Scheer's thoughtful analysis of the issue, whether the MPDCRA applies retroactively is a novel and complex issue of state law that would best be adjudicated in state court and not in a case involving many complex issues of federal law. For the foregoing reasons, this Court will dismiss without prejudice Plaintiff's claim under the MPDCRA.

Plaintiff is hereby directed to Michigan Compiled Laws § 600.5856 regarding the tolling of the state statute of limitations. *See Lee v. Grand Rapids Bd. of Educ.,* 148 Mich.App. 364, 384 N.W.2d 165 (1986).

## IV CONCLUSION

For the reasons delineated above,

**IT IS HEREBY ORDERED** that the Court accepts and adopts the Magistrate Judge's report and recommendation, except insofar as it pertains to Plaintiff's ability to: (1) bring suit against Defendants in their individual capacities pursuant to 42 U.S.C. § 12203(a); (2) seek recovery for emotional or mental injuries in light of 42 U.S.C. § 1997e(e) of the PLRA; and (3) proceed with his claim under the MPDCRA.

**IT IS FURTHER ORDERED** that Plaintiff cannot bring suit against Defendants in their individual capacities pursuant to 42 U.S.C. § 12203(a).

**IT IS FURTHER ORDERED** that 42 U.S.C. § 1997e(e) does not apply retroactively and is thus no obstacle to Plaintiff's recovery for emotional or mental injuries.

**IT IS FURTHER ORDERED** that Plaintiff's claim under the MPDCRA is **DISMISSED WITHOUT PREJUDICE** under 28 U.S.C. § 1367(c).

**SO ORDERED.**

## REPORT AND RECOMMENDATION

SCHEER, United States Magistrate Judge.

### I. RECOMMENDATION

This cause comes before the Court on Plaintiff's Fourth Amended Complaint; Defendants' Rule 12(b)(6) Motion for Dismissal and Rule 56(b) Motion for Summary Judgment; Defendants' Supplemental Brief in Support of Their Dispositive Motion; Plaintiff's Reply Brief to Defendants' Recent Dispositive Motion; and Plaintiff/Intervenor's Brief in Opposition to Defendants' Rule 12(b)(6) Motion for Dismissal and Rule 56(b) Motion for Summary Judgment. For the reasons that follow, I recommend that Defendants' Motion to Dismiss be **GRANTED IN PART AND DENIED IN PART.** Specifically, I recommend that:

(1) the Court dismiss Plaintiff's monetary and punitive damage claims under the Americans with Disabilities Act against Defendants in their official capacity;

(2) the Court dismiss Plaintiff's monetary and punitive damage claims under Title II of ADA and Section 504 of the Rehabilitation Act of 1973 against Defendants in their individual capacities;

(3) that the Court dismiss Plaintiff's claims that accrued after March 10, 2000, under the Michigan Persons with Disability Civil Rights Act;

(4) that the Court deny Defendants' motion to dismiss Plaintiff's claims under the Rehab Act on the basis of Eleventh Amendment immunity;

(5) that the Court deny Defendants' motion to dismiss Plaintiff's claim for injunctive relief under the ADA and the Rehab Act;

(6) that the Court deny Defendant's motion to dismiss Plaintiff's retaliation claims under the ADA against Defendants in their individual capacities;

(7) that the Court deny Defendants' motion to dismiss Plaintiff's claims that accrued before March 10, 2000, under the Michigan Persons with Disabilities Civil Rights Act;

(8) that the Court deny Defendants' motion to dismiss Plaintiff's ADA and Rehab claims under the Prison Litigation Reform Act;

(9) and that the Court deny Defendant's motion to dismiss Plaintiff's claim for injunctive relief.

### II. REPORT

#### A. FACTUAL AND PROCEDURAL BACKGROUND

Plaintiff David Key is a prisoner in the custody of the Michigan Department of Corrections ("MDOC"). Defendants are Paul Rencio, the warden at the Mid–Michigan Correctional Facility; Henry Grayson, the Warden of the Parnall Correctional Facility; Gary Gabry, the former Chairperson of the Michigan Parole Board; Bill Martin, the Director of the MDOC; and Kenneth McGinnis, the former Director of

the MDOC. All Defendants, except McGinnis, are sued in their official and individual capacities. McGinnis is sued only in his individual capacity. The following statement of facts is taken primarily from Plaintiff's Fourth Amended Complaint.

Plaintiff is hearing impaired. He is currently serving a sentence for second degree criminal sexual conduct. As part of the treatment plan recommended by the MDOC Reception and Guidance Center staff, Plaintiff is required to participate in sex offender and substance abuse therapy. Plaintiff also desired to participate in sex offender therapy because Michigan Protective Services would not allow him to return to his home and to his children after his release on parole, without completing the therapy.

Plaintiff alleges that he sought to participate in sex offender therapy at various times during his incarceration at the Carson City Correctional Facility ("Carson City") and that Defendants denied him access to group and individual sex offender therapy and to substance abuse therapy because of his hearing disability.

In August 1999, Plaintiff was transferred to the Mid–Michigan Correctional Facility ("Mid–Michigan"). Mid–Michigan does not provide services, such as TDD units, certified interpreters, flashing alarm clocks, closed captioned television sets, or certified interpreters for sex offender and substance abuse therapy, to hearing impaired prisoners. Plaintiff had received such services, except for a certified interpreter and therapy for hearing impaired prisoners, while at Carson City. Key asserts that Defendants refused to transfer Key from Mid–Michigan to the Cotton Facility in retaliation for Plaintiff filing this lawsuit and his refusal to settle it.[1] In October 1999, Plaintiff finally received some sex offender group therapy. The psychologist conducting the group was not certified in sign language and no interpreter was provided.

Plaintiff has been reviewed for release on parole at least three times. Each time the Michigan Parole Board has denied his request for parole. The Parole Board's denials were based upon its inability to determine whether Plaintiff posed a risk to society because he had not completed the recommended therapy.

Plaintiff alleges that Defendants violated the Americans With Disabilities Act, 42 U.S.C. § 12101, et seq ("ADA"); the Rehabilitation Act of 1973, 29 U.S.C. § 794, as amended ("the Rehab Act"), and the Michigan Persons with Disabilities Civil Rights Act, M.C.L. § 37.1301, et seq ("MPDCRA"), by denying him services because of his hearing disability.[2] Plaintiff also alleges that Defendants retaliated against him for filing this lawsuit in violation of the anti-retaliation provisions of the ADA. He seeks an injunction directing Defendants to provide him access to certified hearing impaired interpreters, and ordering Defendants to provide him with services, such as sex offender and substance abuse therapy with a certified interpreter, a TDD unit, and a flashing alarm clock. He also seeks compensatory and punitive damages, attorney fees and costs.

1. It is unclear whether Defendants refused to transfer Plaintiff from Mid–Michigan back to Carson City or to the J. Robert Cotton Facility. However, to which facility Plaintiff sought to be transferred is not pertinent to the resolution of the issues presented in Defendants' motion.

2. The Michigan Persons with Disabilities Civil Rights Act was formerly known as the Michigan Handicappers Civil Rights Act.

Defendants move to dismiss on the grounds: (1) that Congress exceeded its authority under § 5 of the Fourteenth Amendment when it passed the ADA and the Rehab Act and therefore the Defendants are immune under the Eleventh Amendment;(2) Defendants cannot be held liable under Title II of the ADA and the Rehab Act in their individual capacities; (3) that the Michigan Persons with Disabilities Civil Rights Act does not apply to correctional facilities; (4) that punitive damages are not available under Title II of the ADA or under the Rehab Act; (5) that Plaintiff's claim for injunctive relief is moot; and (6) that Plaintiff's claim for damages is precluded by the Prison Litigation Reform Act ("PLRA"). Defendants move for summary judgment on the grounds: (1) that they are entitled to qualified immunity; and (2) that Plaintiff has not shown the personal involvement of Martin, McGinnis, Gabry, Grayson, and Rencio.

## B. *STANDARD OF REVIEW FOR RULE 12(B)(6) MOTION TO DISMISS AND RULE 56(B) MOTION FOR SUMMARY JUDGMENT*

Federal Rule of Civil Procedure 12(b)(6) provides that a complaint must be dismissed if it fails to state a claim upon which relief may be granted. In assessing a motion to dismiss, the Court "must construe the complaint in the light most favorable to the plaintiff, accept all factual allegations as true, and determine whether the plaintiff undoubtedly can prove no set of facts in support of his claims that would entitle him to relief." *In Re DeLorean Motor Co.*, 991 F.2d 1236, 1239–40 (6th Cir.1993) (citing *Meador v. Cabinet for Human Resources*, 902 F.2d 474, 475 (6th Cir.) *cert. denied,* 498 U.S. 867, 111 S.Ct.

182, 112 L.Ed.2d 145 (1990)); *see also, Conley v. Gibson,* 355 U.S. 41, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957). To defeat a motion to dismiss, the opposing party must allege sufficient facts in the complaint, as to each material element, so that a decision in his favor is conceivable under the legal theory he is advancing. *Scheid v. Fanny Farmer Candy Shops, Inc.*, 859 F.2d 434, 436 (6th Cir.1988).

Federal Rule of Civil Procedure 56 provides that a motion for summary judgment may be granted when the moving party establishes that there are no genuine issues of material fact for trial and that he is entitled to judgment as a matter of law. *Celotex v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). The court must consider all pleadings, affidavits, and admissions on file and draw all justifiable inferences in favor of the party opposing the motion. *Smith v. Hudson,* 600 F.2d 60, 64 (6th Cir.), *cert. dismissed,* 444 U.S. 986, 100 S.Ct. 495, 62 L.Ed.2d 415 (1979). The moving party bears the burden of showing the court that no genuine issues of material fact remain. *Agristor Financial Corp. v. Van Sickle,* 967 F.2d 233, 236 (6th Cir.1992). The non-moving party may not rest upon the allegations or denials of the adverse party's pleadings, but must set forth "specific facts showing that there is a genuine issue for trial." F.R.Civ.P. 56(e); *Celotex,* 477 U.S. at 323–324, 106 S.Ct. 2548.

## C. *DISCUSSION AND ANALYSIS*

## 1. *ELEVENTH AMENDMENT IMMUNITY*

Defendants urge the Court to reconsider its earlier determination that the ADA and the Rehab Act are constitutional as applied to the States.[3] Defendants contend that

---

**3.** In a Report and Recommendation dated February 24, 1997, I recommended that the

Court find that Congress validly abrogated the States' Eleventh Amendment immunity. On

since 1997, the United States Supreme Court has held that several statutes are unconstitutional as applied to the States because Congress exceeded its authority under Section 5 of the Fourteenth Amendment when it invalidated the States' Eleventh Amendment immunity. In particular, Defendants note that the current Supreme Court struck down the Religious Freedom Restoration Act ("RFRA")[4], and the Age Discrimination in Employment Act ("ADEA").[5] In addition, the Court of Appeals for the Sixth Circuit held that Congress exceeded its authority under § 5 of the Fourteenth Amendment when it abrogated the States' Eleventh Amendment immunity in the Family Medical Leave Act. *Sims v. University of Cincinnati*, 219 F.3d 559 (6th Cir.2000). Defendants primarily rely on *Popovich v. Cuyahoga County Court of Common Pleas*, 227 F.3d 627 (6th Cir.2000), in which the Sixth Circuit held that Congress exceeded its authority under Section 5 of the Fourteenth Amendment when it abrogated the States' Eleventh Amendment immunity in Title II of the ADA. The Sixth Circuit agreed to hear the case *en banc*, vacated the *Popovich* decision on December 12, 2000, and ordered it held in abeyance pending the Supreme Court's decision in *Board of Trustees of the University of Alabama v. Garrett*, 531 U.S. 356, 121 S.Ct. 955, 148 L.Ed.2d 866 (2001). Nevertheless, because of the number of recent decisions addressing the issue of the Congressional abrogation of the States' Eleventh Amendment immunity, I find the issue merits reconsideration in this case.

The Eleventh Amendment to the United States' Constitution provides:

The judicial power of the United States shall not be construed to extend to any suit in law or equity commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens or Subjects of any Foreign State.

By its terms, the Eleventh Amendment applies only to suits against a state by citizens of another state. However, the Supreme Court has extended its application to suits by citizens against their own state. *Kimel v. Florida Bd. of Regents*, 528 U.S. 62, 72–73, 120 S.Ct. 631, 145 L.Ed.2d 522 (2000); *Seminole Tribe of Florida v. Florida*, 517 U.S. 44, 54, 116 S.Ct. 1114, 134 L.Ed.2d 252 (1996). "The ultimate guarantee of the Eleventh Amendment is that nonconsenting States may not be sued by private individuals in federal court." *Board of Trustees of the University of Alabama v. Garrett*, 531 U.S. 356, 121 S.Ct. 955, 148 L.Ed.2d 866 (2001).

■ There are three exceptions to a State's sovereign immunity under the Eleventh Amendment. A state may waive its immunity and consent to suit in federal court. *Green v. Mansour*, 474 U.S. 64, 68, 106 S.Ct. 423, 88 L.Ed.2d 371 (1985). Second, the Eleventh Amendment does not bar a suit against a state official seeking prospective relief to end a continuing violation of federal law. *Ex Parte Young*, 209 U.S. 123, 167, 28 S.Ct. 441, 52 L.Ed. 714 (1908). Third, Congress may validly abrogate the States' Eleventh Amendment immunity. *Seminole Tribe*, 517 U.S. at 55, 116 S.Ct. 1114.

■ To determine whether Congress has validly abrogated the States' sovereign immunity, a court "must answer two

---

April 4, 1997, the Court issued an order adopting my Report and Recommendation.

**4.** See, *City of Boerne v. Flores,* 521 U.S. 507, 117 S.Ct. 2157, 138 L.Ed.2d 624 (1997).

**5.** See, *Kimel v. Florida Bd. of Regents,* 528 U.S. 62, 120 S.Ct. 631, 145 L.Ed.2d 522 (2000).

questions: first, whether Congress has unequivocally express[ed] its intent to abrogate the immunity ... and second, whether Congress has acted pursuant to a valid exercise of power." *Florida Prepaid Postsecondary Educ. Expense Bd. v. College Savs. Bank,* 527 U.S. 627, 635, 119 S.Ct. 2199, 144 L.Ed.2d 575 (1999); *Seminole,* 517 U.S. at 55, 116 S.Ct. 1114. Section 12202 of the ADA provides:

A state shall not be immune under the Eleventh Amendment to the Constitution of the United States from an action in a Federal or State court of competent jurisdiction for a violation of this chapter.

42 U.S.C. § 12202. Congress satisfied the first requirement by expressly stating an intent to abrogate the States' Eleventh Amendment immunity. *Garrett,* at 974; *Lavia v. Pennsylvania Department of Corrections,* 224 F.3d 190, 196 (3rd Cir. 2000). Therefore, this Court must determine whether Congress acted within its constitutional authority by subjecting the States to suits in federal court for money damages under the ADA.

▮▮▮▮ Congress may not base its abrogation of the States' Eleventh Amendment immunity upon the commerce powers enumerated in Article I. See, *Kimel,* 528 U.S. at 79, 120 S.Ct. 631. It may base its abrogation on the enforcement provisions in Section 5 of the Fourteenth Amendment. *Fitzpatrick v. Bitzer,* 427 U.S. 445, 456, 96 S.Ct. 2666, 49 L.Ed.2d 614 (1976). Section 1 of the Fourteenth Amendment provides:

No State shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States; nor shall any State deprive any person of life, liberty, or property, without due process of law; nor deny to any person within its jurisdiction the equal protection of the laws.

Section 5 of the Fourteenth Amendment grants Congress the power to enforce the substantive guarantees contained in Section 1 by enacting appropriate legislation. *Garrett,* at 974. "... Congress' power 'to enforce' the Amendment includes the authority both to remedy and to deter violations of rights thereunder by prohibiting a somewhat broader swath of conduct including that which is not itself forbidden by the Amendment's text." *Garrett,* at 974 (quoting *Kimel,* 528 U.S. at 81, 120 S.Ct. 631). However, Congress' enforcement powers under Section 5 are not unlimited. *City of Boerne,* 521 U.S. at 518–19, 117 S.Ct. 2157. For a legislative enactment to be a valid exercise of this power, Congress must "identify conduct that transgresses the Fourteenth Amendment's substantive provisions and must tailor its legislative scheme to remedying or preventing such conduct." *Florida Prepaid,* 119 S.Ct. at 2207; *Stevens v. Illinois Dep't of Transportation,* 210 F.3d 732, 737 (7th Cir.2000).

The Supreme Court, in *City of Boerne,* developed the congruence and proportionality test to protect against "impermissible attempts by Congress to determine the substance of the Fourteenth Amendment." *Cisneros v. Wilson,* 226 F.3d 1113, 1119 (10th Cir.2000). The Court stated: "There must be a congruence and proportionality between the injury to be prevented and the means adopted to that end." *City of Boerne,* 521 U.S. at 520, 117 S.Ct. 2157. "The appropriateness of the remedial measure must be considered in light of the evil presented." *Id.* at 530, 117 S.Ct. 2157. "The first step in applying these now familiar terms is to identify with some precision the scope of the constitutional right at issue." *Garrett,* at 2176. The second step is to examine whether Congress identified a history and pattern of unconstitutional discrimination. *Id.* at 2176.

In *Garrett*, the Supreme Court used these principles when it addressed whether Congress exceeded its authority under Section 5 of the Fourteenth Amendment in abrogating States' immunity under Title I of the ADA. Applying the congruence and proportionality test, the Supreme Court first held that, "States are not required by the Fourteenth Amendment to make special accommodation for the disabled, so long as their actions towards such individuals are rational." *Garrett*, slip op. at 9. The Court based that finding on its decision in *Cleburne v. Cleburne Living Center, Inc.*, 473 U.S. 432, 105 S.Ct. 3249, 87 L.Ed.2d 313 (1985). In *Cleburne*, the Supreme Court held that the Court must apply a rational basis test to distinctions based on disability. *Cleburne*, 473 U.S. at 439–442, 105 S.Ct. 3249. The result of *Cleburne* is "that States are not required by the Fourteenth Amendment to make special accommodation for the disabled, so long as their actions towards such individuals are rational." *Erickson v. Board of Governors of State Colleges and Universities for Northeastern Illinois Univ.*, 207 F.3d 945, 949 (7th Cir.2000). Thus, rational discrimination on the basis of a disability does not violate the Constitution. *Id.*

The Supreme Court found that certain rights and remedies created by the ADA against the States fail the congruence and proportionality test. The Court noted that Title I of the ADA requires employers to make reasonable accommodation to "make existing facilities used by employees readily accessible to and usable by individuals with disabilities." 42 U.S.C. §§ 12112(5)(B), 12111(a). Although the ADA excepts employers from making reasonable accommodations in certain circumstances, § 12112(b)(5)(A), nevertheless, the accommodation duty "far exceeds what is constitutionally required in that it makes unlawful a range of alternate responses that would be reasonable but would fall short of imposing an undue burden upon the employer." *Garrett*, at 966. "The Act also makes it the employer's duty to prove that it would suffer such a burden, instead of requiring (as to the Constitutional does) that the complaining party negate reasonable basis for the employer's decision." *Id.* at 966–67. In addition,

The ADA also forbids utilizing standards, criteria or methods of administration that disparately impact the disabled, without regard to whether such conduct has a rational basis. § 12112(b)(3)(A). Although disparate impact may be relevant evidence of racial discrimination, see *Washington v. Davis*, 426 U.S. 229, 239, 96 S.Ct. 2040, 48 L.Ed.2d 597 (1976), such evidence alone is insufficient even where the Fourteenth Amendment subjects state action to strict scrutiny.

*Id.* at 966. The Supreme Court then compared the remedial provisions of the ADA to those of the Voting Rights Act of 1965. In addition to finding that Congress documented a "marked pattern of unconstitutional action by the States" in the Voting Rights Act, the Supreme Court noted that Congress responded by promulgating a "detailed but limited remedial scheme designed to guarantee meaningful enforcement of the Fifteenth Amendment in those areas of the Nation where abundant evidence of States' systematic denial of those rights was identified." *Garrett*, at 966. The ADA and the ADEA presumptively forbid consideration of attributes that the Constitution permits states to consider, and then, like the RFRA, require the State to carry a burden of persuasion in order to take the characteristics into account. *Erickson*, 207 F.3d at 949. The ADA, thus, "prohibits very little conduct likely to be held unconstitutional." *Kimel*, 120 S.Ct. at 648.

As the Supreme Court noted in footnote 1 of *Garrett*, the remedies in Title I of the ADA differ from those in Title II. Title II prohibits a broad swath of conduct without permitting an inquiry into the States' legitimate interest. Title II provides:

> Subject to the provisions of this subchapter, no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity.

42 U.S.C. § 12132. "Qualified individual with a disability" is defined as:

> an individual with a disability who with or without reasonable modifications to rules, policies, or practices, the removal of architectural, communication, or transportation barriers, or the provision of auxiliary aids and services, meets the essential eligibility requirements for the receipt of services or the participation in programs or activities provided by a public entity.

§ 12131(2).

Title II's explicit provisions prohibit public entities from excluding disabled individuals from participating in or enjoying the benefits of public services. However, Title II contains an implicit requirement—the requirement of accommodation. Title II's definition of "qualified individual with a disability imposes an affirmative obligation on public entities to accommodate disabled individuals." *Popovich*, 227 F.3d at 638.[6] Unlike Title I, Title II makes no statutory exceptions to its duty to accommodate. As the Court of Appeals for the Sixth Circuit observed:

The accommodation requirement with its limited regulatory exceptions, reaches far beyond conduct likely to violate the Equal Protection Clause. Accommodation requires special treatment for the disabled in situations where facially neutral policies and practices adversely impact the disabled due to their physical or mental impairments. Such action may be constitutionally required only in cases where the State adopts the challenged policy because of, not in spite of, the limitations of the disabled. Title II makes no attempt to distinguish between those neutral policies that violate the Equal Protection Clause and those that do not.

*Popovich*, 227 F.3d at 639. The accommodation requirement under the ADA is, thus similar, to that in RFRA.

What the RFRA did for religion, the ADA does for disabilities. In neither situation does the Constitution forbid neutral laws or practices that create disparate impacts; in neither situation does the Constitution require accommodation. Both the RFRA and the ADA replace the Constitution's approach with a prohibition of disparate impact and jettison neutrality in favor of accommodation .... [T]here is a countervailing difference that makes the ADA more adventuresome. The Free Exercise Clause forbids all intentional discrimination against religious practices; the Equal Protection clause has no similar rule about disabilities. Rational discrimination against persons with disabilities is constitutionally permissible in a way that rational discrimination against religious practices is not. This makes the ADA harder than the RFRA to justify under § 5 ... The statute is outside the

---

**6.** As indicated above, the *Popovich* decision was vacated on December 12, 2000. While it has no value in terms of precedent, nevertheless, several passages in the opinion offer guidance to the Court.

boundaries of constitutional discourse in a way that RFRA was not.

*Erickson,* 207 F.3d at 951. Thus, Title II inappropriately prohibits constitutional as well as unconstitutional conduct.

The second step that the Court must undertake is to examine whether Congress identified a history and pattern of unconstitutional discrimination. In *Garrett,* after examining the legislative history of the ADA, the Supreme Court concluded that the history failed "to show that Congress did in fact identify a pattern of irrational state discrimination in employment against the disabled." *Garrett,* at 958. The Court noted that Congress made a "general finding in the ADA that 'historically, society has tended to isolate and segregate individuals with disabilities, and, despite some improvements, such forms of discrimination against individuals with disabilities continues to be a serious and pervasive social problem.' 42 U.S.C. § 12101(a)(2)."; *Garrett,* slip op. at 11. It further observed that the record assembled by Congress included a number of instances that supported the finding, but that the vast majority of those instances did not concern activities of the States. The Court concluded, "these instances taken together fall short of even suggesting the pattern of unconstitutional discrimination on which § 5 must be based." *Id.* at 958.

Justice Breyer, in his dissent in *Garrett,* listed roughly 300 examples of discrimination by state governments that were contained in the legislative record. See *Garrett* at Appendix C. The Majority Opinion discounted those examples as "unexamined, anecdotal accounts of adverse, disparate treatment by state officials." *Garrett,* slip op. at 12. They also observed that the examples came not from Congress, but from the Task Force on the Rights and Empowerment of Americans with Disabilities, which made no findings on state discrimination in employment. *Id.* at 958. In footnote 7, the Majority notes that only a small fraction of the examples in Appendix C relate to state discrimination in employment. *Id.* The Majority further observed that "[t]he overwhelming majority of those accounts pertain to the alleged discrimination by the States in the provision of public services and public accommodations, which areas are addressed in Titles II and III of the ADA." *Id.*

Unlike discrimination in state employment, Congress did mention discrimination in the provision of public services in its legislative findings: "(3) discrimination against individuals with disabilities persists in such critical areas as employment, housing, public accommodations, education, transportation, communication, recreation, institutionalization, health services, voting, and access to public services." 42 U.S.C. § 12101. As Judge Wood of the Seventh Circuit Court of Appeals noted in her dissent in *Erickson,* many of those areas, particularly voting, institutionalization, public services, and education are areas that are controlled by the state government. *Erickson,* 207 F.3d at 957 (Wood dissent). Moreover, unlike employment, both the House and Senate Reports support Justice Breyer's conclusions that States participated in societal discrimination against the disabled. The Senate Committee Report 10–116 reached the following conclusions: "Discrimination still persists in such critical areas as employment in the private sector, public accommodation, public services, transportation, and telecommunications. The House Report 101–485, pt. II, drew the same conclusion. Although the Reports do not explicitly refer to the States, it is only logical that it is the States' public services to which it refers, as discrimination on the basis of disability by federal entities in the

provision of public services was already prohibited by the Rehab Act."

■ While I am satisfied that Congress made findings that the disabled suffer discrimination in the provision of public services, I note that Congress did not differentiate, in any manner, whether the discrimination was rationally related to a legitimate governmental objective. Therefore, the discrimination prohibited by Title II of the ADA is not demonstrably limited to unconstitutional discrimination. Thus, I find, under the congruence and proportionality test, that the substantive provisions of Title II of the ADA impose burdens on the States that are disproportionate to any unconstitutional conduct that could conceivably be targeted by the Act. Therefore, I find that Congress exceeded its authority in abrogating the States' Eleventh Amendment immunity. Accordingly, Defendants, in their official capacities, are immune from monetary liability under Title II of the ADA.

■ Section 504 of the Rehab Act prohibits "any program or activity" that receives federal financial assistance from discriminating against a qualified individual with a disability. 29 U.S.C. § 794(a). The Act requires States that accept federal funds to waive their Eleventh Amendment immunity in suits brought in federal court for violations of Section 504. 42 U.S.C. § 2000d–7. The United States Supreme Court has held that Section 2000d–7 is an unambiguous waiver of the State's Eleventh Amendment immunity. *Lane v. Pena*, 518 U.S. 187, 200, 116 S.Ct. 2092, 135 L.Ed.2d 486 (1996). The waiver is valid under the Spending Clause *Florida Prepaid*, 527 U.S. at 635–36, 119 S.Ct. 2199 (Congress may require a waiver of state sovereign immunity as a condition for receiving federal funds, even though Congress could not order the waiver directly.) There is no dispute that the MDOC accepts federal funds. Therefore, Defendants, in their official capacities, are not immune from liability under the Rehab Act.

## 2. QUALIFIED IMMUNITY

■ Defendants next contend that they are entitled to qualified immunity because it is not clearly established that the ADA or the Rehab Act can be enforced against the States under the Eleventh Amendment. To determine whether government officials are entitled to qualified immunity the Court must determine: (1) whether a plaintiff has shown a violation of a constitutional or statutory right, and (2) whether that right was clearly established such that a reasonable government official would have understood that his behavior violated that right. *Dickerson v. McClellan*, 101 F.3d 1151, 1157–58 (6th Cir.1996).

Because I recommend that the Court find that States are immune from liability under Title II of the ADA, Defendants claim for qualified immunity is moot. With respect to the Rehab Act, the Supreme Court in *Lane v. Pena, supra*, stated that the States do not have Eleventh Amendment immunity from suits alleging discrimination on the basis of a disability under the Rehab Act if they accept federal funds. The Supreme Court decided *Lane* in 1996. Thus, the States lack of Eleventh Amendment immunity from claims under the Rehab Act was clearly established in 1996. Accordingly, Defendants are not entitled to qualified immunity on this basis.

## 3. INDIVIDUAL LIABILITY UNDER THE ADA AND REHAB ACT

Defendants next assert that they cannot be held liable as individuals under Title II of the ADA or under the Rehab Act. Title II of the ADA provides, in relevant part that "no qualified individual with a disabili-

ty shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." 42 U.S.C. § 12132. The ADA defines "public entity" as any state or local government or department, agency, special purpose district, or other instrumentality of a state or local government. 42 U.S.C. § 12131. The definition does not include individuals. The statutory remedies suggest that individual liability was not contemplated by Congress.

> Section 12132 of the Disability Act is to be enforced with the remedies, procedures, and rights established under the Rehab Act, 29 U.S.C. § 794a. Section 794a invokes the remedies, procedures, and rights of portions of titles VI and VII of the Civil Rights Act of 1964. Nothing in the language of the Rehabilitation Act and the Disability Act sections above explicitly authorizes or prohibits suits against individuals acting in their individual capacities. The sections of the Civil Rights Act of 1964 which the Rehabilitation Act and the Disability Act invoke provides some guidance. Only 42 U.S.C. § 2000e–16(c) explicitly addresses the issue, providing in employment actions against the federal government, that the head of the department, agency, or unit, as appropriate shall be the defendant. This statutory directive suggests that plaintiff's cannot assert claims against individuals in their individual capacities.

*Montez v. Romer*, 32 F.Supp.2d 1235, 1240 (D.Colo.1999). Moreover, personal liability has been rejected under both Titles I and III of the ADA. See, *EEOC v. AIC*

*Security Investigations, Ltd.*, 55 F.3d 1276, 1279 (7th Cir.1995) and *Guckenberger v. Boston Univ.*, 957 F.Supp. 306, 321–22 (D.Mass.1997).

■ Nearly every court that has considered the issue has held that Title II claims cannot be maintained against state officials in their individual capacities. See, *Alsbrook v. City of Maumelle*, 184 F.3d 999, 1005, n. 8 (8th Cir.1999)(*en banc*), *cert. granted* 528 U.S. 1146, 120 S.Ct. 1003, 145 L.Ed.2d 947 (2000) and *cert. dismissed*, 529 U.S. 1001, 120 S.Ct. 1265, 146 L.Ed.2d 215 (2000); *Lewis v. New Mexico Dep't of Health*, 94 F.Supp.2d 1217, 1230 (D.N.M.2000); *Calloway v. Boro of Glassboro Dept. of Police*, 89 F.Supp2d 543, 557 (D.N.J.2000); *Yeskey v. Pennsylvania Dep't of Corrections*, 76 F.Supp.2d 572, 575 (M.D.Pa.1999); *Montez v. Romer*, 32 F.Supp.2d 1235, 1240 (D.Colo.1999). But *cf. Niece v. Fitzner*, 922 F.Supp. 1208, 1218–19 (E.D.Mich.1996)(holding Title II claim may be maintained against individual defendants).[7] Accordingly, I follow the great weight of authority and find that Defendants may not be held liable under Title II of the ADA in their individual capacities.

■ The Rehab Act provides, in relevant part:

> No otherwise qualified individual with a disability . . . shall solely by reason of his or her disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance . . .

29 U.S.C. § 794(a). The Rehab Act defines "program or activity" to include "all of the operations of . . . [ ] a department, agency, special district, or other instru-

---

7. The Court in *Niece* did not consider the enforcement scheme for Title II of the ADA. Rather, after little analysis, it concluded that because the ADA is a "broad remedial statute

enacted to eliminate discrimination against disabled persons . . . it must be construed broadly to carry out its purpose." *Niece*, 922 F.Supp. at 1218–19.

mentality of a State or of a local government ... any part of which is extended Federal financial assistance." 29 U.S.C. § 794. There is nothing in the language of the Rehab Act that expressly authorizes or prohibits suits against individuals acting in their individual capacities. As set forth above, the remedial scheme of the Rehab Act suggests that there is no individual cause of action against nonemployer defendants in their individual capacities. *Hallett v. New York State Dep't of Correctional Services*, 109 F.Supp.2d 190 (S.D.N.Y. 2000); *Munoz, supra*. Moreover, since the ADA and the Rehab Act are to be construed similarly, 42 U.S.C. §§ 12134, 12201, I find that Plaintiff may not maintain an action against Defendants in their individual capacities under the Rehab Act.

Plaintiff argues that because he has alleged retaliation under the ADA, he may hold defendants individually liable. Section 12203(a) provides:

> No person shall discriminate against any individual because such individual has opposed any act or practice made unlawful by this Act or because such individual made a change, testified, assisted or participated in any matter, in an investigation, proceeding, or hearing under this Act.

The retaliation provision directs an aggrieved person to the remedies and procedures under sections 12117, 12133, and 12188. 42 U.S.C. § 12203(c). A claimant asserting that a person retaliated against him or her in the context of public services is referred to section 12133, the remedial provisions for Title II.

I find the discussion in *Smith v. University of the State of New York*, 1997 WL 800882 (W.D.N.Y.Dec.31, 1997), persuasive. As that Court observes, the legislative history of the ADA suggests that it is the discriminatory practices of public enti-

ties, not individuals that are targeted by Title II.

> Title II of the legislation has two purposes. The first purpose is to make applicable the prohibition against discrimination on the basis of disability, currently set out in regulations implementing section 504 of the Rehabilitation Act of 1973, to all programs, activities, and services provided or made available by state and local governments or instrumentalities or agencies thereto, regardless of whether or not such entities receive Federal financial assistance. * * * Specifically, section 202 [codified at 42 U.S.C. § 12132] provides that no qualified individual with a disability shall, by reason of such disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination by a *department, agency, special purpose district, or other instrumentality of a State or local government.*

H.R.Rep. No. 101–485(II) at 84 (1990).

However, the legislative intent in passing section 12203(a) of the ADA suggests that individual liability was contemplated for acts of retaliation.

> Section 502(a) [codified at 42 U.S.C. § 12203(a) ] of the legislation provides that *no individual shall discriminate* against another individual [for opposing practices which violate the ADA or for assisting in proceedings brought thereunder].

*Smith*, 1997 WL 800882 at *7 (quoting H.R.Rep. No. 101–485(II), at 138 (1990)). The use of the word "person" in subsection (a) is explicitly more expansive than the term "public entity" used in Title II. Had Congress intended that "person" did not include individuals it could have said so. Therefore, I find that, logically, individual liability attaches under the retaliation provisions of the ADA. Plaintiff may pursue a

claim against Defendants for damages under his retaliation theory.

### 4. *MICHIGAN PERSONS WITH DISABILITIES CIVIL RIGHTS ACT*

Defendants next assert that Plaintiff's state law claim under the Michigan Persons with Disabilities Civil Rights Act, M.C.L. § 37.1101, should be dismissed because the Act does not govern state correctional facilities. In *Doe v. Michigan Department of Corrections*, 236 Mich.App. 801, 601 N.W.2d 696 (1999)(*Doe I*), the Michigan Court of Appeals held that prison inmates are protected by the MPDCRA. That opinion was vacated and the Michigan Court of Appeals appointed a special panel to address the issue of whether the MPDCRA applied to prisoners. The special panel in *Doe v. Department of Corrections*, 240 Mich.App. 199, 201, 611 N.W.2d 1 (2000)(*Doe II*), held that the antidiscrimination provisions of the MPDCRA apply to prisons and to prison inmates. On March 10, 2000, in direct response to *Doe II*, the Michigan Legislature amended § 37.1301, to except state and county correctional facilities from the definition of public service .[8]

The "Historical and Statutory Notes" to § 37.1301 provide:

P.A.1999, No. 201, enaction Section 1. This amendatory act is curative and intended to correct any misinterpretation of legislative intent in the Court of Appeals decision in *Doe v. Department of Corrections*, 236 Mich.App. 801, 601 N.W.2d 696 (1999). This legislation further expresses the original intent of the legislature that an individual serving a sentence of imprisonment in a state or county correctional facility is not within the purview of this Act.

Defendants contend that the change in the statute eliminated Plaintiff's cause of action. Plaintiff, relying on *Karl v. Bryant Air Conditioning*, 705 F.2d 164 (1983), argues that Michigan law does not allow a new statute to abolish a cause of action that has already vested.

The effective date of the Amendment to the Act was March 10, 2000. Therefore, Plaintiff has no cause of action for any violations of the Act from March 10, 2000 forward. With respect to any cause of action that accrued before March 10, 2000, I concluded that such cause of action may be maintained. Defendants urge the Court to rely on the subsequent legislative history of the Act. Subsequent legislative history is "a hazardous basis for inferring the intent of an earlier" legislature. *United States v. Price*, 361 U.S. 304, 313, 80 S.Ct. 326, 4 L.Ed.2d 334 (1960); *Consumer Product Safety Comm'n v. GTE Sylvania, Inc.*, 447 U.S. 102, 117, 100 S.Ct. 2051, 64 L.Ed.2d 766 (1980); *Pension Benefit Guaranty Corp. v. LTV Corp.*, 496 U.S. 633, 650, 110 S.Ct. 2668, 110 L.Ed.2d 579 (1990). As Justice Scalia stated in his concurring opinion in *Sullivan v. Finkelstein*, 496 U.S. 617, 110 S.Ct. 2658, 110 L.Ed.2d 563 (1990),

The legislative history of a statute is the history of its consideration and enactment. "Subsequent legislative history"—which presumes the *post*-enactment history of a statute's consideration

---

**8.** The statute provides:
  (b) "Public service" means a public facility, department, agency, board or commission owned, operated, or managed by or on behalf of this state or a subdivision of this state, or county, city, village, township, or independent or regional district in this state or a tax exempt private agency established to provide service to the public, except that public service does not include a state or county correctional facility with respect to actions or decisions regarding an individual serving a sentence of imprisonment.

and enactment—is a contradiction in terms. The phrase is used to smuggle into judicial consideration legislator s expressions not of what a bill currently under consideration means (which, the theory goes, reflects what their colleagues understood they were voting for), but of what a law previously enacted means.

\* \* \* \* \* \*

In my opinion, the views of a legislator concerning a statute already enacted are entitled to no more weight than the views of a judge concerning a statute not yet passed.

*Finkelstein,* 496 U.S. at 631–32, 110 S.Ct. 2658.

In this case, the "subsequent legislative history" is supposed to tell us what the Michigan legislators in the 1999 session thought the legislators from the 1976 legislative session, some twenty three years earlier, intended. It would be fair to say that very few, if any, of the legislators that divined the intent of the 1976 legislature were actually members of the legislature who considered and voted on the Michigan Handicappers Civil Rights Act in 1976. The Michigan Legislature is clearly attempting to do precisely that which Justice Scalia criticizes—smuggle into judicial consideration legislator's expressions of what a law previously enacted means.

"[T]he starting point for interpreting a statute is the language of the statute itself." *Consumer Product Safety,* 447 U.S. at 108, 100 S.Ct. 2051. "Absent a clearly expressed legislative intention to the contrary, that language must ordinarily be regarded as conclusive." *Id.* As the Michigan Court of Appeals held in *Doe II,* and in Judge White's concurring opinion in *Doe I,* the meaning of "public service" as defined in M.C.L. § 37.1301(b), is plain and clear and is analogous to the definition of public entity in the ADA. That is, the

MPDCRA plainly covered prisons until the Amendments of Public Act 201 of 1999 went into effect on March 10, 2000. Accordingly, Plaintiff's claim that Defendants violated his rights under the MPDCRA between 1996 and March 10, 2000 remains viable.

### 5. *PUNITIVE DAMAGES*

Defendants next contend that punitive damages are not available under Title II of the ADA or under the Rehab Act. Congress did not explicitly provide for punitive damages under § 504 of the Rehab Act or under Title II of the ADA. *Moreno v. Consolidated Rail Corp.,* 99 F.3d 782, 788 (6th Cir.1996)(en banc). The Sixth Circuit, in *Moreno,* engaged in a lengthy analysis of whether punitive damages may be awarded under § 504 of the Rehab Act. *Moreno,* 99 F.3d at 788–792. It concluded, en banc, that Congress did not intend to allow such damages. *Id.* at 791. They further found that punitive damages were not appropriate in a section 504 action as: (1) Congress placed a monetary limit on punitive damages under § 501 of the same Act; (2) Congress provided other methods by which to punish offenders of § 504, and (3) such damages "are hardly necessary to punish thoughtlessness, and [there is] no reason to believe that the administrative scheme and threat of compensatory damage awards are not adequate to accomplish the task of deterrence." *Id.* at 792. In *Johnson v. City of Saline,* 151 F.3d 564 (6th Cir.1998), the Sixth Circuit extended that principle and held that punitive damages are not available under Title II of the ADA. *Johnson,* 151 F.3d at 573. See also, *Doe v. County of Centre, PA,* 242 F.3d437 (3rd Cir.2001).

Although a number of other courts outside this Circuit have allowed an award of punitive damages under the ADA and the Rehab Act, see *Todd v. Elkins,* 105 F.3d

663 (8th Cir.1997); *Burns–Vidlak v. Chandler,* 980 F.Supp. 1144 (D.Hawai'i 1997); *Kilroy v. Husson College,* 959 F.Supp. 22 (D.Me.1997); *Hernandez v. Hartford,* 959 F.Supp. 125 (D.Conn.1997), I must follow the existing precedent in the Sixth Circuit. Accordingly, I recommend that Plaintiff's claims for punitive damages under Title II of the ADA and the Rehab Act be dismissed.

### 6. *PLRA*

Defendants move to dismiss Plaintiff's claims under the Rehab Act and under the ADA. They rely upon the provisions in the Prison Litigation Reform Act. Title 42 U.S.C. § 1997e(e) provides:

> LIMITATION ON RECOVERY: No Federal civil actions may be brought by a prisoner confined in a jail, prison, or other correctional facility, for mental or emotional injury suffered while in custody without a prior showing of physical injury.

The plain language of the statute suggests that all federal civil actions, including those brought under the ADA, the Rehab Act, and constitutional principles, are subject to this limitation. *Cassidy v. Indiana Department of Corrections,* 199 F.3d 374, 376–77 (7th Cir.2000); *Dawes v. Walker,* 239 F.3d 489 (2nd Cir.2001)(Judge Walker's separate opinion). Plaintiff has alleged no physical injury. While the PLRA forecloses recovery by Plaintiff for emotional and mental injuries, he may pursue all of his other claims for damages and relief, including nominal damages, not otherwise restricted by the other sections of this Report and Recommendation.

### 7. *CLAIM FOR INJUNCTIVE RELIEF*

Finally, Defendants argue that Plaintiff's claim for injunctive relief is moot because he completed sex offender therapy in July 2000. Neither Defendants nor Plaintiff have provided the Court with an affidavit or an official certification that Plaintiff has, in fact, completed sex offender therapy such that he will not be denied consideration for parole status. Given the history of this case, until I receive an affidavit or some sort of official certification that Plaintiff has completed the recommended sex offender therapy, I will not recommend that the Court find Plaintiff's claim for injunctive relief moot.

### D. *CONCLUSION*

For the reasons stated above, I recommend that Defendants' Motion to Dismiss be **GRANTED IN PART AND DENIED IN PART.** I further recommend that the following claims survive Defendants' Motion: (1) Plaintiff's claim for injunctive relief under Title II of the ADA and under Section 504 of the Rehab Act; (2) Plaintiff's claim for retaliation under the ADA; (3) Plaintiff's claims under the MPDCRA that accrued before March 10, 2001; and (4) Plaintiff's claim for monetary damages against Defendants in their official capacity under the Rehab Act.

### III. *NOTICE TO PARTIES REGARDING OBJECTIONS:*

The parties to this action may object to and seek review of this Report and Recommendation, but are required to act within ten (10) days of service of a copy hereof as provided for in 28 U.S.C. Section 636(b)(1) and E.D. Mich. LR 72.1(d)(2). Failure to file specific objections constitutes a waiver of any further right of appeal. *United States v. Walters,* 638 F.2d 947 (6th Cir. 1981), *Thomas v. Arn,* 474 U.S. 140, 106 S.Ct. 466, 88 L.Ed.2d 435 (1985), *Howard v. Secretary of Health and Human Services,* 932 F.2d 505 (6th Cir.1991). Filing of objections that raise some issues but fail to raise others with specificity, will not

preserve all the objections a party might have to this Report and Recommendation. *Smith v. Detroit Federation of Teachers Local 231*, 829 F.2d 1370, 1373 (6th Cir. 1987), *Willis v. Sullivan*, 931 F.2d 390, 401 (6th Cir.1991). Pursuant to E.D. Mich. LR 72.1(d)(2), a copy of any objection is to be served upon this Magistrate Judge.

Within ten (10) days of service of any objecting party's timely filed objections, the opposing party may file a response. The response shall not be more than five (5) pages in length unless by motion and order such page limit is extended by the Court. The response shall address specifically, and in the same order raised, each issue contained within the objections.